GLENSHAW GLASS COMPANY, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 36536. Filed March 14, 1955.

---

*Sidney B. Gambill, Esq., Joseph D. Block, Esq.,* and *Max Swiren, Esq.,* for the petitioner.

*Albert J. O'Connor, Esq.,* for the respondent.

1006

1010

**OPINION.**

ARUNDELL, *Judge:* Immediately prior to October 1934, petitioner was manufacturing glass containers by means of a Shawkee feeder. That feeder had been developed by petitioner and others in the glass industry in an effort to be relieved from the domination of Hartford-Empire patents and the payment of royalties under these patents. Petitioner was in the process of replacing all of its royalty-paying equipment with royalty-free Shawkee feeders. In October 1934, Hartford-Empire was successful in obtaining an injunction against petitioner in the Federal court, prohibiting its use of its Shawkee

feeders. Petitioner thereupon dismantled the Shawkee feeders and reconverted its plant to equipment on which it was required to pay royalties to Hartford-Empire. It continued to pay such royalties throughout its base period. In December 1940, and just after the close of petitioner's base period, petitioner ceased to pay these royalties, because facts had developed in antitrust litigation brought by the United States against Hartford-Empire in December of 1939, which disclosed that Hartford-Empire had successfully established, defended, and sustained its patent position by means of fraud. In ensuing litigation, it was held that the 1934 injunction against petitioner had been obtained by Hartford-Empire's fraud and that petitioner was entitled to recover damages.

Petitioner claims that this situation demonstrates that its base period net income was an inadequate standard of normal earnings to the extent of the amount of royalties paid during those years. Petitioner filed its claims for refund on the ground that it was entitled to relief from excess profits tax under the provisions of section 722 (b) (5). That is the only section upon which petitioner relies.

As we said in *Clinton Carpet Co.*, 14 T. C. 581, section 722 (b) (5) of the statute was enacted by Congress "to make the statute flexible enough to take care of 'unpredictable' abnormal cases and it confidently expected the provisions to be intelligently and sympathetically administered. Ways and Means Committee Report, No. 146, 77th Cong., 1st sess., p. 2." What section 722 (b) (5) of the statute requires is that petitioner establish that:

(b) * * * its average base period net income is an inadequate standard of normal earnings because—

　　*　　　*　　　*　　　*　　　*　　　*　　　*

(5) of any other factor [1] affecting the taxpayer's business which may reasonably be considered as resulting in an inadequate standard of normal earnings during the base period and the application of this section to the taxpayer would not be inconsistent with the principles underlying the provisions of this subsection, and with the conditions and limitations enumerated therein.

We believe that petitioner has shown such to be the case here. Petitioner's base period payment of royalties under a decree obtained by Hartford-Empire's fraud was the required factor causing an inadequate standard of normal earnings. It was a marked event, happening just prior to petitioner's base period. Without this occurrence, there can be no doubt that petitioner would not have paid these royalties. It certainly cannot be said by any proper measure that in such circumstances its base period earnings could be other than an inadequate standard of normal earnings. See *Ainsworth Manufacturing Corporation*, 23 T. C. 372, and cf. *Edgewater Steel Co.*, 23 T. C. 613.

---

[1] I. e., other than the factors set forth in other subsections of sec. 722 (b) of the statute.

Nor do we discern any inconsistency between granting relief to petitioner under section 722 (b) (5) and the principles underlying the other provisions of this subsection.[2] This is not a case where there was an inadequacy of a taxpayer's showing under other subsections of section 722 (b), and claim was made under section 722 (b) (5) with the thought that (b) (5) was an equitable "catch-all" to include cases in which such inadequacies were found to exist. See *Granite Construction Co.*, 19 T. C. 163. Petitioner cannot qualify under any of the other subsections of section 722 (b) and its relief can only be supported by section 722 (b) (5). As we have indicated, we think it clear that the payment of the royalties during the base period, flowing from the fact that just prior to its base period petitioner was enjoined by means of the fraudulent representations of Hartford-Empire and precluded from using its royalty-free Shawkee feeders, is such an "other factor affecting the taxpayer's business which may reasonably be considered as resulting in an inadequate standard of normal earnings during the base period," as set forth in section 722 (b) (5). It might be that fraud should always be regarded as unusual and abnormal, but we also know here that never before had petitioner had a fraudulent injunction against it. The fact that this injunction, induced as it was by fraud, occurred just prior to and was an adverse factor influencing petitioner's entire base period serves to distinguish the case at bar from *Alexandria Amusement Corporation*, 16 T. C. 446. Fraud permeated the entire period, and disrupted petitioner's standard of normal base period earnings *ab initio*. That the last payments of royalties were made for 2 months next following the close of petitioner's base period seems to us to serve to establish the existence of the fraud during the period which petitioner had been long endeavoring to confirm and which had been made manifest in the antitrust trial which began in December 1939. These peculiar circumstances serve to distinguish this case from *Telfair Stockton & Co.*, 21 T. C. 239, and *Clinton Carpet Co., supra*. Moreover, in those cases the factors for which adjustment was sought arose from normal business arrangements.

In concluding that the present situation qualifies under section 722 (b) (5), there has been no disposition on our part to approach the problem as a matter of broad equitable principles. That is not the purpose of section 722 (b) (5) or, indeed, of section 722 itself. It is because we believe this situation fits the conditions required by the statute in section 722 (a) and (b) that we have deemed it as qualify-

---

[2] Nor is there an inconsistency between petitioner's present seeking of sec. 722 (b) (5) relief and the conclusion in *Glenshaw Glass Co.*, 13 T. C. 296, that the base period royalty payments were not abnormal under sec. 711 (b) (1) (H) because they were not attributable to a "decree" under that provision of the statute.

ing.  Cf. *Constitution Publishing Co.*, 23 T. C. 19, and *Alexandria Amusement Corporation, supra.*

Respondent vigorously contends that in any event petitioner's constructive average base period net income should not be computed, as petitioner would have it, by directly increasing its profits for each of the base period years by the amount of royalty paid during those years, with a resulting constructive average base period net income of $217,428.08.  Respondent's position is that the Hartford-Empire's control over the glass container industry was such that it was only because of it that extremely favorable prices existed which permitted the members of the industry, including petitioner, to sell their products at a price sufficient to pass the royalty on to the consumer and to make a profit for themselves.  In other words, respondent contends that without Hartford-Empire's control the price structures would be so adversely affected that petitioner would lose the benefit of the elimination of the royalty payment.

While there is some force to respondent's argument, nevertheless, it seems to us that this control of the industry by Hartford-Empire does not mean that petitioner would not have been able to reap some benefit had it been released from the payment of royalties during the base period year.  It has been established that petitioner and others in the glass container industry for years made strong efforts to be relieved of royalty payments to Hartford-Empire.  It is difficult to believe that if the release from such payments would not be reflected advantageously in their incomes these glass manufacturers would choose to fight Hartford-Empire.

Respondent urges, alternatively, that in any event there would be some diminution of the benefit stemming from the base period release of royalty payment by reason of the elimination of the mark-up on the item of royalties which petitioner had included in its cost of goods sold, as well as additional depreciation on the newly installed Shawkee feeder, increased Pennsylvania income tax on the augmented income, and increases in officers' salaries which had been found in an early proceeding in this Court (13 T. C. 296) to have been "low" prior to 1943.  On the other hand, petitioner would offset such adjustments by its claim that the Hartford-Empire control had eliminated a glass fruit jar business in which it alleges to have had increasingly valuable prospects.  As to the latter, it might be noted in passing that when petitioner was free to do so it never resumed the glass fruit jar business.

The weighing of conjectural matter is always difficult, but the difficulty does not eliminate the necessity for doing so.  Considering the entire record, adjudging and evaluating the many aspects of the complete economic picture, we have concluded, as our ultimate fact indi-

cates, that petitioner is entitled to use a constructive average base period net income of $195,000.

Reviewed by the Special Division.

*Decision will be entered under Rule 50.*