OPINION. Mulroney, Judge: Petitioner seeks relief under section 722 (a) and (b) (4), Internal Revenue Code of 1939. The pertinent provisions of the Code appear below.[2] Sectional references are to the 1939 Code unless otherwise stated. In determining its excess profits tax liability for the taxable years 1941-1945, inclusive, petitioner used the invested capital method to compute its excess profits credit. Under the invested capital method, petitioner’s excess profits credit for each taxable year ranged upward from $13,779.43 for 1941 to $19,883.12 for 1945. Such credits resulted in a lesser tax liability for the taxable years than would have been imposed if petitioner’s excess profits credit had been computed under the income method because the credits under the latter method would have been computed upon an actual average base period net income of $2,652.87, and an average computed under the growth formula (sec. 713 (f)) of $7,539.37. Petitioner seeks relief under section 722 (b) (4) claiming that it is entitled to constructively increase its base period level of earnings because it changed the character of its business during such period. The (b) (4) factors upon which it relies are: (1) A change in management, and (2) the acquisition of the business of a competitor. Petitioner contends that, because of such change in character, its business did not reach the earning level by the end of the base period that it would have reached if such change had occurred 2 years earlier, and that, had such change occurred 2 years earlier, a fair and just amount representing normal earnings would be $22,932.66 for 1941 and $35,822.90 for 1942-1945, inclusive. Among other cases, petitioner relies upon Royal Crown Bottling Co. of Knoxville, 22 T. C. 688 (1954), and Wentworth Military, Scientific, Etc. Co., 22 T. C. 721 (1954). Respondent contends that the Hall family continued their control of the petitioner, that the employment of a general manager did not constitute a change in management, and that no significant change in basic management policies resulted therefrom. Respondent also contends that such changes as were made during the base period were routine and normal changes which occur during the ordinary course of any well run business; that there was no substantial departure from normally expected changes; and that petitioner has failed to show that a higher level of normal earnings was directly attributable to such changes as were made. Respondent cites Toledo Stove & Range Co., 16 T. C. 1125 (1951), as the leading case for his position. With respect to the acquisition of the printing, binding, and lithographing business of Crane and Company, respondent contends that no change in the character of petitioner’s business occurred for the reason that its operations remained substantially unchanged after such acquisition. Respondent contends further that petitioner has failed to establish that its level of normal earnings increased materially as a direct result of such acquisition, and that, even if such acquisition be deemed a change in character of the business, petitioner has failed to show that, as a result thereof, its average base period net income, computed under section 713 (f), is an inadequate standard of normal earnings, Irwin B. Schwabe Co., 12 T. C. 606, 613 (1949), or to establish what would be a fair and just amount representing normal earnings. Kentucky Whip & Collar Co., 19 T. C. 743 (1953). Petitioner argues its evidence establishes a “change in the character of the business” within the definition of section 722 (b) (4) in that there was during the base period “a change in the operation or management of the business” and “the acquisition before January 1, 1940, of all or a part of the assets of a competitor, with the result that the competition of such competitor was eliminated.” Petitioner also had the burden of showing “that as a direct result thereof [of the change in the character of the business] there were increased earnings.” Granite Construction Co., 19 T. C. 163, 171. Petitioner points to the evidence showing the earnings for a period after the change are greater than earnings for a period prior to the change. Such evidence would not be conclusive that the increased earnings were directly attributable to the change. Granite Construction Co., supra. We think petitioner, under the facts of this case, had a third burden with respect to establishing the amownt of a constructive average base period net income. It will be remembered petitioner received heavy-credits under the invested capital method. Before it shows itself entitled to any relief under section 722, petitioner would have to establish a constructive average base period net income sufficient to give it a credit for the taxable years 1941 to 1945 in excess of the credit to which it is entitled under the invested capital method. In Mokry & Tesmer Machine Co., 23 T. C. 12, 18, we said: petitioner, to be entitled to relief under section 722, must show not only that its average base period net income is an inadequate standard of normal earnings, but must establish what would be a fair and just amount representing normal earnings, and there is still no relief under section 722 unless the excess profits credit, based upon the constructive average base period net income which is established, is greater than the excess profits credit computed without the benefit of section 722. Green Spring Dairy, Inc., 18 T. C. 217, 237; Lamport Co., 17 T. C. 1079, 1084, 1085; General Metalware Co., 17 T. C. 286, 292; and Trunz, Inc., 15 T. C. 99, 105. We can assume there was the change in the character of the business in the base years and some increased earnings occurred as a direct result of the change. As shown in our Findings of Fact, the actual average base period net income, computed without the application of section 722, would be $2,652.87 and its average base period net income computed under section 713 (f) would be $7,539.37. The question is whether, under the record presented, the additional earnings caused by the changes in the character of the business could have produced an average for the base period sufficient to produce a credit in excess of the credits allowed and used by petitioner under the invested capital method. The invested capital credits were as follows: Calendar year Ewoesa profits credit invested capital method 1941_ _$13, 779. 43 1942_ _ 14,547.87 1943-_ 15,267.46 1944-_ 16,547. 00 1945 — _ _ 19,883.12 From the above it will be seen the invested capital credit is about twice the section 713 (f) credit and many times the actual average base period net income credit. We realize that the changes made by Severin were intangible in their effect on petitioner’s earnings. Petitioner lists those we have set forth in our Findings of Fact and states with respect thereto, “It is difficult to place a dollar sign on these changes, yet it seems fair to conclude that such factors would result in increased earnings.” The record furnishes no basis for determining whether the increased volume of petitioner’s mail order business, record books, and general printing was profitable or resulted in losses. We do not know whether the average annual sales of Crane and Company for the 4 years prior to petitioner’s acquisition, which amounted to $118,026, was profitable. We do not know whether petitioner was able to maintain such average annual volume. If petitioner’s own sales continued to increase in 1938 over its 1937 sales of $200,738, then the volume of sales from the Crane and Company acquisition amounted to very little, for petitioner’s 1938 sales were only $246,980. On the other hand, if petitioner maintained the Crane and Company average for 1938 and 1939 of $118,026, then petitioner’s volume of sales from its own business was less than its 1936 or its 1937 sales. The only certain fact with respect to petitioner’s earnings or losses from its acquisition of a portion of the Crane and Company business and assets is that the results of operating the enlarged business for the 19 months of 1938 and 1939 are reflected in petitioner’s net profit of $7,349.32 for 1938 and $973.26 for 1939, and we have been provided with no information as to how such figures can be allocated between the business and assets acquired and the business petitioner had at the date of acquisition. The evidence will not establish a fair and just amount that can be used as a constructive average base period net income which would result in a credit in excess of the credit already allowed under the invested capital method. No witness for petitioner was asked to express any opinion as to the amount of a constructive average base period net income. We can see no basis in this record for applying the 2-year push-back rule set forth in section 722 (b) (4). The purpose of that rule, as stated in Del Mar Turf Club, 16 T. C. 749, 766 (1951), “is to establish a figure which is assumed to be the maximum amount which would have been earned by the taxpayer in its last base period year,” if it had changed the character of its business 2 years before it did. Petitioner has offered no proof of what such maximum amount would be under the facts of record. We appreciate the difficulty of proof to show increased earnings would result from changes in method of doing business but one could conclude the changes inaugurated by Severin and the acquisition of Crane and Company could have resulted in 6 to 9 times the average net income and still it would be insufficient to produce a credit equal even to the lowest credit allowed under the invested capital method. We think the evidence falls far short of establishing such facts. In its brief petitioner contended that a fair and just amount representing normal earnings to be used as a constructive average base period net income is $22,932.66 for 1941, and $35,822.90 for 1942 to 1945, inclusive. These amounts were based upon, with immaterial minor adjustments, estimated sales of $447,000 for 1939. This amount is an arbitrary figure, set forth in petitioner’s application for relief, which is unsupported by any evidence of record. In fact, none of petitioner’s witnesses were asked to express an opinion as to petitioner’s reconstructed sales. In reconstructing its sales for 1939, petitioner, in its brief, projected sales for 2 years under three methods, namely, (1) geometric straight line, (2) straight line sum of the least squares, and (3) second degree parabola. The average of these three methods, plus expected sales of A. B. Dick products, resulted in constructed sales of $460,312.80 as compared with the $447,000 sales estimate used in its application for relief. Using the latter sales figure, an index which is not in the record, and estimated percentages for cost of sales, selling and administrative expense, a net operating profit to sales, petitioner has backcast to arrive at reconstructed figures for the base period years. Its computations result in reconstructed net income for each of the base period years in excess of $33,000. We can find no justification in the record for the constructive sales for 1939, for the index used in backcasting, or for the percentages used, which are at variance with the percentage analysis shown in our Findings of Fact. No evidence whatever was offered that petitioner might achieve a level of sales of $447,000 in 1939, that the index was proper, or that the percentages were accurate. We hold, therefore, that petitioner has failed to establish a fair and just amount to be used as a constructive average base period net income which would give to the petitioner an excess profits credit in the years 1941 through 1945 greater than the excess profits credit computed under the invested capital method to which petitioner is already entitled. Petitioner, in short, has failed to establish the inadequacy of the alternative excess profits credits available to it under sections 713 and 714 of the Internal Revenue Code of 1939. We have carefully examined the Royal Crown Bottling Co. case, supra, cited by petitioner, but find it distinguishable on its facts from the instant case. Petitioner is not entitled to relief under section 722. Reviewed by the Special Division. Decision will he entered for the respondent. SEC. 722. GENERAL RELIEF — CONSTRUCTIVE AVERAGE BASE PERIOD NET INCOME. (a) General Rule. — In any case in which the taxpayer establishes that the tax computed under this subchapter (without the benefit of this section) results in an excessive and discriminatory tax and establishes what would be. a fair and just amount representing normal earnings to be used as a constructive average base period net income for the purposes of an excess profits tax based upon a comparison of normal earnings and earnings during an excess profits tax period, the tax shall be determined by using such constructive average base period net income in lieu of the average base period net income otherwise determined under this subchapter. In determining such constructive average base period net income, no regard shall be had to events or conditions affecting the taxpayer, the industry of which it is a member, or taxpayers generally occurring or existing after December 31, 1939, * * * (b) Taxpayers Using Average Earnings Method. — The tax computed under this sub-chapter (without the benefit of this section) shall be considered to be excessive and discriminatory in the case of a taxpayer entitled to use the excess profits credit based on income pursuant to section 713, if Its average base period net income is an inadequate standard of normal earnings because— *••*••* (4) the taxpayer, either during or immediately prior to the base period, commenced business or changed the character of the business and the average base period net income does not reflect the normal operation for the entire base period of the business. If the business of the taxpayer did not reach, by the end of the base period, the earning level which it would have reached if the taxpayer bad commenced business or made the change in the character of the business two years before It did so, it shall be deemed to have commenced the business or made the change at such earlier time. For the purposes of this subparagraph, the term “change in the character of the business” includes a change in the operation or management of the business, a difference in the products or services furnished, a difference in the capacity for production or operation, a difference in the ratio of nonborrowed capital to total capital, and the acquisition before January 1, 1940, of all or part of the assets of a competitor, with the result that the competition of such competitor was eliminated or diminished. • » *